Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for freight charges admittedly earned in carrying freight for the Government, but not paid because the Government claimed that the plaintiff had overcharged it on former shipments, and deducted the amount of the alleged overcharges from the freight earned. The question is whether the plaintiff did overcharge the Government on the former shipments and, if so, whether it was lawful for the Government to pay itself for the overcharges by deducting their amount from the freight later earned by the plaintiff.
At an earlier stage of this case the plaintiff made a motion for a summary judgment. The court rendered an opinion denying the motion, which opinion is reported in 125 C. Cls. 2B5. The history of the controversy and the contentions then made by the parties are stated in that opinion. After the denial of the motion for a summary judgment, the case went to trial before a commissioner of this court, who has made a report finding the facts which he regarded as pertinent. The parties have again briefed and argued the case.
The rates charged on the earlier shipments, here asserted *3 by the Government to liave been overcharges, are sought to be justified by the plaintiff because, it claims, they were authorized by Service Order No. 68 of the Interstate Commerce Commission, effective February 15, 1942. In our former decision we held that if Service Order No. 68 is interpreted as authorizing a railroad to furnish a car longer than the car ordered by the shipper, and charge the shipper for the extra and unnecessary capacity, even though the carrier had available and could have furnished a car of the size ordered, Service Order No. 68 was illegal because it was beyond the powers of the Interstate Commerce Commission to issue such an order. We let the case go to trial in order to ascertain whether, in the instances involved in this suit, the railroad, when it furnished cars larger than those ordered by the Government, did so because it was unable to furnish cars of the sizes ordered.
In the hearing before our commissioner, the evidence as to whether the railroad was unable to furnish cars of the size ordered was by no means conclusive. For that reason, apparently, the plaintiff urges other reasons why it ought to prevail, and we will discuss those reasons first.
The plaintiff urges that if we decide that the Government was overcharged on the shipments in question, we will be reviewing the reasonableness of rates fixed by the Interstate Commerce Commission, and that we have no jurisdiction to do that. In our earlier opinion in this case we recognized that we had no such jurisdiction. We did assert jurisdiction, in a case otherwise properly before us, to decide the question of law as to whether the Commission had the power, under the statutes, to issue Service Order No. 68, if that order is to be given the effect which the plaintiff claims for it. We called attention to the statement by the Supreme Court in United States v. Jones, 336 U. S. 641, in which the Court discussed a number of cases in which this court had made decisions regarding the charges of carriers whose rates were fixed by the Commission. The Court said, at page 667:
In each of these cases the claimant carrier recovered compensation in excess of that allowed it by the Postmaster General, but in each case the dispute centered around the meaning of a Commission rate order or the Commis *4 sion’s power to enter the order made: [Italics in original.]
The Commission is the body authorized by law to make rates, but it is not a body authorized to make law; therefore any court in which the question of the legal power of the Commission becomes relevant to the decision of a case, must decide that question.
The plaintiff urges that, regardless of the power of the Commission to issue Service Order No. 68 with the effect claimed for it, the railroad filed a tariff embodying the rule of the Service Order, and the rate fixed in that tariff thereupon became the only lawful rate. The tariff filed was only a quotation of Service Order No. 68 and a short statement as to its meaning. A tariff repeating an unlawful order of the Interstate Commerce Commission can not, we think, be valid if the order authorizing it is invalid. We have reconsidered the question of our jurisdiction, in this regard, and adhere to the views expressed in our former opinion.
The plaintiff says that this court has no jurisdiction to permit the Government’s asserted setoff because the claim of overcharge asserted in the setoff is barred by the statute of limitations. Section 16 of the Interstate Commerce Act, 49 U. S. C. 16, prescribes a 2-year statute of limitations on actions for overcharges or for reparations based on unreasonableness of published tariffs. Such a cause of action accrues when a shipment is delivered. The shipments here in question were delivered in 1944. The plaintiff’s suit, based of course upon later shipments on which it admittedly earned freight, was not filed until 1952, and the Government’s answer, asserting the overcharges on the 1944 shipments, was filed thereafter.
If the Government had filed its claim for overcharges with the Interstate Commerce Commission, it would have had to do so within 2 years after 1944. U. S. v. A and W. Ry. Co. 294 I. C. C. 5, 12. Under Section 322 of the Transportation Act of 1940, 49 U. S. C. 66 (1946 Ed.), the United States is required to pay charges for transportation without waiting for an audit by the General Accounting Office. However,
the right is reserved to the United States Government to deduct the amount of any overpayment to any such *5 carrier from any amount subsequently found to be due said carrier.
Since a claim by a railroad for an administrative settlement may be presented to the General Accounting Office at any time within 10 years after the claim accrues, 31 U. S. C. 71a, 237, and since such a claim may be sued upon in this court at any time within 6 years after it accrues, 28 U. S. C. 2501, Seaboard Airline Railroad Co. v. United States, 113 C. Cls. 437, cert. den. 338 U. S. 848, it would be remarkable if the Government’s right of setoff were barred 2 years after the delivery of the goods. The 2-year provision of 49 U. S. C. 16 (3) (b) and (c) relied on by the plaintiff, are applicable to all shippers, but relate only to (b) claims made before the Interstate Commerce Commission and (c) actions at law. The special provision of 49 U. S. C. 66, quoted above, seems to put no time limit on the right of the United States to make deductions, which is consistent with the general doctrine that statutes of limitations do not run against the sovereign.
We conclude that the Government’s setoff is not asserted too late, and must be considered on its merits.
To repeat, we held in our earlier decision in this case that the plaintiff could not justify its charges on the basis of Service Order No. 68, to the extent that that order purported to permit a carrier which had available a car of the size ordered, to furnish a larger car and charge the higher rate of the larger car. The remaining question, then, was the question of fact as to whether the plaintiff, when it furnished the larger cars, had available cars of the sizes ordered. Since the shipments in question were made in 1944; the offsets were not asserted, even informally, until 1950; were not pleaded in this case until 1952; and the trial was not held until 1955; the evidence is not clear as to what was done in 1944. The parties dispute as to who had the burden of proof. Since the Government is seeking to set off, against an admittedly valid claim, a claim which it asserts arising out of another transaction, it has the burden of persuading us as to the validity of its offset. However, as a practical matter, the evidence as to the availability of cars of the sizes ordered would be in the hands of the plaintiff railroad, *6 and hence it was expected to give us all the information it had. It did not have much. It is probable that most of the search for cars would have been carried on by telephone, and there would have been no occasion to make a record of the inquiries and the answers to them. A “Report of Cars on Hand” was made by the railroad’s yardmaster or agent at each terminal, yard, or station. Those records were required to be kept for 3 years, but were destroyed several years before the trial of this case.
In the absence of direct evidence, the plaintiff was allowed to introduce as “secondary evidence” the testimony of the Superintendent of Transportation of the railroad which received and forwarded the shipments in question, as to the procedure customarily followed by that railroad in 1944 in supplying freight cars ordered by shippers. His testimony is summarized in finding 11. It is, in effect, that the railroad, at the time and place in question, always furnished cars of the type ordered, if such cars were reasonably available. This testimony is believable. We think the natural thing for a responsible agent of a railroad to do would be to supply the customer with what he ordered, if that could reasonably be done. There may have been many cases where it would have been arguable how far one should have gone in his inquiry as to where the cars were, how far a car should be hauled empty to be made available to a shipper at a particular point, etc. There were no doubt some cases in which railroads, and perhaps this railroad, inexcusably failed to furnish shippers with cars of the sizes ordered. On the evidence, we are convinced that that was not generally done, and we have no reason to suppose that it was done in the instance here in litigation.
The plaintiff is entitled to a judgment for $239.80.
It is so ordered.
Laramoee, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Wilson Cowen, makes the following findings of fact:
*7 1. Plaintiff is a corporation created, organized, and existing under the laws of the State of Virginia, is a common carrier by railroad of persons and property for hire in the southeastern section of the United States, and as such is engaged in interstate commerce and subject to the Interstate Commerce Act, its tariff charges for transportation services rendered being duly published and filed as required by law. Plaintiff’s lines of railroad connect with the. lines of other common carriers by railroad who are likewise engaged in interstate commerce and subject to the Interstate Commerce Act and whose tariff charges for transportation services rendered are duly published as required by law.
2. The plaintiff sues the Government for freight charges earned by it in carrying goods for the Government, but not paid because they were set off by the Government’s fiscal officers against alleged overcharges on an earlier shipment. In 1944 the Government ordered five open cars, each to be 40 feet long, to carry certain trailers from Mansfield, Louisiana. The trailers could have been loaded on 40-foot cars. The railroad presented five cars, each 42 feet long. The Government used the 42-foot cars. By published tariffs in force at the time, the minimum weights for which the shipper had to pay freight charges for carload shipments, even though his load weighed less than those minima, were, for 40-foot cars, 20,000 pounds, and for 42-foot cars, 24,400 pounds. The trailers weighed less than either of these mini-ma. The difference in freight charges for the different minimum weights for the five cars was, for the shipments here in question, $239.80.
3. The dispute between the parties arises out of the interpretation and application of Service Order No. 68, which was issued by the Interstate Commerce Commission on January 30, 1942, and became effective February 15, 1942. Service Order No. 68, promulgated under the authority granted by the provisions of the Interstate Commerce Act, 49 U. S. C. 1 (15), provided as follows:
It appearing, That, due to the existing state of war, an emergency exists which, in the opinion of the Commission, requires immediate action to prevent shortage of railroad equipment and congestion of traffic; and
*8 It further appearing, That the provisions contained in Rules 24 and 34 of Consolidated Freight Classification No. 14, as amended, and other tariffs containing similar provisions in respect of the furnishing, substitution, and use of multiple cars for single shipments, sup-ject to carload rates, result in wasteful car service in interstate commerce; and
It also appearing, That such misuse and wasteful use of railroad equipment is detrimental to the public interest and to the prosecution of the war:
Therefore, in respect to interstate commerce:
It is ordered,
1. That the operation of Rule 24 of Consolidated Freight Classification No. 14, as amended, be, and it is hereby, suspended.
2._ That the operation of Rule 34 of Consolidated Freight Classification No. 14, as amended, in so far as it permits railway freight cars to be used for the shipment of carload freight otherwise than subject to the carload minimum weight for each car used be, and it is hereby, suspended: Provided, That this paragraph shall not be deemed to apply to or affect those portions of Rule 34 which provide carload minimum weights graduated according to car length or capacity.
3. That the operation of all provisions in all other tariffs filed by common carriers by railroad with the Commission which, in like manner, as or in modification or extension of, Rule 24 and of that portion of Rule 34 herein suspended, permit railway freight cars (whether such cars are loaded by shipper or carrier) to be used for the shipment of carload freight, including livestock, otherwise than subject to the established carload minimum weight for each car used, be, and they are hereby, suspended: Provided, That this paragraph shall not be deemed to apply to or affect the provisions of Rule 29 of Consolidated Freight Classification No. 14, as amended, or any similar provisions in other tariffs, relating to minimum weights for carload shipments of articles which by reason of their length require two or more open cars for their transportation.
4. That all outstanding orders of the Commission, in so far as they conflict with the provisions of this order, be, and they are hereby, suspended.
5. That this order shall become effective February 15, 1942, and shall remain in force until further order ox the Commission; that a copy thereof shall be served upon each common carrier by railroad subject to the Interstate Commerce Act; and that each of said railroads, on *9 or before the effective date hereof, and upon one day’s notice to the Commission and to the public, in substantial accordance with the provisions of Buie 9 (k) of the Commission’s Tariff Circular No. 20, shall publish, file, and post a supplement to each of its tariffs affected hereby, announcing; the suspension of any of the provisions therein.
6. That notice of this order be given to the general public by depositing a copy thereof in the office of the Secretary of the Commission at Washington, D. C.
4. On or prior to June 5, 1944, the Government ordered from the W. C. Nabors Company of Mansfield, Louisiana, certain stockroom trailers and spare parts, and supplied that company with the necessary Government bills of lading for use in shipping the trailers. The Nabors Company ordered from the Mansfield Bailroad and Transportation Company five flat cars, each to be 40 feet long, to carry the trailers from Mansfield, Louisiana, consigned to the Depot Quartermaster, Camp Lejeune, .North Carolina, near Jacksonville, North Carolina. The shipping charges were to be billed to the office of the Quartermaster General of the Marine Corps. The shipper’s authorized agent or employee was declared to be the W. C. Nabors Company.
The following information appeared on the Government bills of lading under which the shipments were made:

5. The Mansfield Bailroad and Transportation Company, the initial carrier, the Texas & Pacific Bailway Co., which furnished the cars and moved them over its route toward the destination, and plaintiff, which was the terminal carrier, were all participating carriers in the classifications and tariffs applicable to the shipment.
The shipments involved in this proceeding originated at Mansfield, Louisiana, and moved in June 1944 to Jacksonville, North Carolina, on 42-foot flat cars furnished by the *10 carrier, in lieu of 40-foot cars ordered by the shipper. All of the shipments, which consisted of stockroom trailers and spare parts, weighed less than the applicable carload minimum weight provided for such commodities in Item 43535 of Western Classification No. 71, also known as CFC No. 16, which minimum weight was 20,000 pounds subject to Eule 34. Southwestern Lines’ Tariff No. 254-B, which published the rates between South Mansfield, Louisiana, and Jacksonville, North Carolina, states on its face that it is governed, except as otherwise provided therein, by Western Classification No. 70, E. C. Fyfe’s ICC No. 28 and by exceptions thereto, Southwestern Lines’ Tariff No. 173-P, J. E. Peel’s ICC No. 3526, and Western Trunk Line Tariff No. 386-D, J. E. Peel’s ICC No. 3519, and supplements to or successive issues of these publications. Western Classification No. 71 canceled No. 70 and was in effect at the time these shipments moved. Southwestern Lines’ Tariff No. 173-P and Western Trank Line Tariff No. 886-D are not involved here. The title page of Southwestern Lines’ Tariff No. 254-B provides “This tariff is subject to the provisions of Tariff No. S. O. 68, Agent L. E. Kipp’s ICC No. A-3391, MF ICC No. A126, supplements thereto or successive issues thereof.”
6. Eule 34 of the Consolidated Freight Classification No. 16, Western Classification No. 71, had been in effect for many years prior to February 15, 1942, at which time Interstate Commerce Commission Service Order No. 68, issued January 30,1942, became effective. Sections 1,2,3, and 4 of Eule 34 apply to closed or box cars, while Sections 5 to 8 relate to open cars. Pertinent provisions of Eule 34 as set out in CFC No. 16, which was in effect at time of movement here involved, are:
He % Jfc # S&
Section 5. When articles shown in the Classification, exceptions thereto or in tariffs governed thereby, subject to this Eule by specific reference to the number thereof; or to the letter “E,” are loaded in open cars 41 feet 6 inches or less in length, they shall be charged at minimum CL weights specified therefor in separate descriptions of articles. When such articles are loaded in open cars exceeding 41 feet 6 inches in length, mini *11 mum CL weights to be charged shall be as provided in Section 8. Weight in excess of minimum weight provided for in this Rule must be charged for.
Section 6. (a) If carrier is unable to furnish open car of length ordered, and furnishes longer car, minimum weight shall be that fixed for car furnished, except that if articles are of such length as could have been loaded on car of length ordered, minimum weight shall be that fixed for car ordered.
Notation must be made by agent on Bill of Lading and Waybill:
Car_ft. in length ordered by shipper and car_ft. in length furnished by carrier under Rule 34 of Consolidated Classification.
Section 7. Except when furnished by carrier in place of shorter open car ordered, if an open car over 36 feet 6 inches in length is used by shipper for loading articles subject to Rule 34, without previous order having been placed by shipper with carrier for car of such size, minimum weight shall be that fixed for car used.
Section 8. (a) Table showing minimum CL weights applicable on articles made subject to Rule 34, in open cars, see Note 3.
$ $ $ $ ‡
Under Section 8 is a tabulation of various minimum weights which, insofar as here applicable, provides that when the minimum carload weight provided in the Classification for the articles stripped is 20,000 pounds (as in this case) and the open car used was over 41 feet 6 inches and not over 42 feet 6 inches in length (in this case), the minimum weight shall be 24,400 pounds, which was the weight applied by plaintiff in billing the defendant for these freight charges.
Under Section 8 appeared Note 3, which read:
When a shipper orders a car of a specified length within and including the minimum and maximum lengths for which the same minimum CL weight is provided in Section 8, the furnishing by a carrier of a car of any length between and including such minimum and maximum lengths will be a fulfillment of shipper’s order.
The above-quoted Sections 6 and 7 were preceded by a symbol consisting of a circled letter “s”, which was explained in the same tariff by the following statement:
*12 Sections 2,4, 6,7, and 9, and Note 4, Rule 34 are under suspension on all traffic. (See Service Order No. 68. page 30 herein.)
Page 30 of CFC No. 16 sets out Service Order No. 68 in full and contains an explanation reading:
Under the above order, Rule 24, page 133 of Consolidated Freight Classification No. 16, also Sections 2, 4, 6, 7, and 9 of Rule 34 and Note 4 thereof, pages 135, 136, and 137 of Consolidated Freight Classification No. 16, are hereby suspended on all traffic.
On page 2 of Supplement 19 to CFC No. 14, which became effective the same date as Service Order No. 68, February 15, 1942, and which was in effect prior to CFC No. 16, Service Order No. 68 is also set out in full and a similar note of explanation is given. The cover of Supplement No. 19 to CFC No. 14 bears a note in the date section reading:
(Issued in compliance with Service Order of the Interstate Commerce Commission No. 68 of January 30, 1942.)
The actual weight of the loading of a car frequently is less than the prescribed tariff minimum weight for the car used, and the prescribed minimum weight is used as the basis for calculating the freight charges.
7. Tariff No. SO-68 published by Agent L. E. Kipp was issued February 11, 1942, to be effective February 15, 1942, and stated on its cover :
Issued in compliance with Service Order No. 68 of January 30, 1942, as amended, of the Interstate Commerce Commission, reproduced on page 3.
Page 3 thereof reproduced Service Order No. 68 in full, and also contained an Item No. 20 captioned “Application” reading, insofar as pertinent, as follows:
The operation of all provisions in tariffs making reference to this tariff, which permit railway freight cars (whether such cars are loaded by shipper or carrier), to be used for the shipment of carload freight, except Live Stock (see Note), otherwise than subject to the established carload minimum weight for each car used, is hereby suspended, effective February 15,1942, except as otherwise provided on Intrastate traffic on page 2.
*13 The foregoing does not apply to or affect provisions relating to minimum weights for carload shipments of articles which by reason of their length require two or more open cars for their transportation.
During the period of suspension carload minimum weights for each car used will be applied.
8. On August 28, 1944, plaintiff rendered its bill for the transportation charges. These charges included the sum of $239.80, representing the difference between the tariff charged for the carload minimum weight for the size of the cars actually furnished to and used by the Government and the charge applicable to the carload minimum weight of the size of cars ordered. The bill was paid by defendant in November 1944. Although plaintiff was not a land-grant carrier, it was party to an equalization agreement entered into between the defendant and non-land-grant railroads. The charges were billed and paid for on the basis of the net land-grant rates.
On June 5, 1950, the General Accounting Office notified plaintiff that its bill had been overpaid in the sum of $239.80. Refund of that amount was requested by the General Accounting Office in a letter of May 4,1951, reading in part as follows:
It is the opinion of this office that the application of Service Order 68 on Government shipments must be interpreted in the light of the service called for by the bill of lading contract.
Notwithstanding, there may be tariff authority for assessing charges on the size car furnished for carrier’s convenience as distinguished from the size of car ordered in the bill of lading contract, the fact remains that by honoring such a tariff provision in connection with a Government shipment, there would result in a seemingly gratuitous gift of public money for which there is no available appropriation.
Plaintiff declined to make refund and on July 6, 1951, it was notified that the $239.80 had been deducted from tariff charges due on other shipments of materials moving under Government bills of lading in May and June 1951. The defendant has not questioned the accuracy of the charges due on the bill from which the deduction was made.
*14 9. The evidence does not sbow whether the shipper’s request for the cars involved here was made orally or in writing nor as to the exact date it was made. However, since the five Government bills of lading were issued on June 5,1944, the request was apparently made on or prior to that date.
The Mansfield Eailway and Transportation Company (hereinafter referred to as M. E. & T.) is a small railroad which has switching facilities at Mansfield, Louisiana, but it owns no freight cars. When the shipper’s request for the cars was made, the M. E. & T. relayed the request to the Texas and Pacific Eailway Co. (hereinafter referred to as the T. & P.), which actually furnished the cars. The five cars furnished consisted of four 42-foot flat cars owned by the T. & P. and one 42-foot flat car owned by the Central of Georgia Eailway Co. The evidence does not show where any of the five cars was located at the time the shipper’s request was received. With respect to the car owned by the Central of Georgia Eailway Co., there is no evidence as to whether this car was borrowed from that company by the T. & P. for this shipment, or whether the particular car was then on the T. & P. lines and was used by it in accordance with the custom of railroads to use cars located on their lines but belonging to other carriers when needed to fill shippers’ orders.
The T. & P. has a station located in South Mansfield, Louisiana. It is a station of the Pleasant Hills Subdivision of the Louisiana Division of the T. & P. The subdivision covers a distance of 82 miles from Eeisor, Louisiana, to Cypress, Louisiana, where it .connects with the main line of the T. & P.
10. In 1944 the T. & P. kept a daily report entitled “Daily Statement of Cars Deceived and Delivered Connecting Lines.” It was compiled by a car accountant employed in the office of the Superintendent of Transportation of the company, who maintained his office in Dallas, Texas. This report covered cars owned by the company and by other carriers and showed the number of cars of each type received daily on the T. & P. lines and the number of each type delivered off its lines each day. It did not provide information as to the dimensions or location of any cars. The Interstate *15 Commerce Commission did not require these daily reports to be maintained, but the T. & P. usually kept them on hand for about a year. None of the reports for 1944 were available at the time of the trial.
In 1944 the T. & P. also maintained a “Report of Cars on Hand,” which was prepared by the agent or yardmaster at each terminal, yard, or station. This report showed the initial, number, kind, class capacity, and contents of each car on hand. It also showed the date the car arrived at a particular station and the number of days the car was detained for loading or other purposes and whether it was empty or loaded. The report is a standard one used by nearly all the railroads. One copy is kept on file by the agent, one is sent to the division superintendent, and a third is mailed to the Superintendent of Transportation. Although the dimensions of cars were not shown in the report, the dimensions of each car reported could be readily ascertained by reference to the car initial and number in the Official Railway Equipment Register. In fact, the report was used by the Superintendent of Transportation to locate cars of unusual dimensions, to find surplus cars, and to ascertain the causes of delay in car movement. The regulations of the Interstate Commerce Commission require the railroads to keep these records on file for a period of three years. Such records of the T. & P. for the year 1944 were destroyed several years prior to the trial of this case.
No other records or reports with respect to the availability of freight cars were maintained by the T. & P., except that the freight car distributor in the office of the Superintendent of Transportation furnished the latter a memorandum each day regarding any difficulties encountered with respect to special types of cars or unusual loadings. These memo-randa were not permanent records and were kept only for a month or two and then destroyed.
When larger cars than those ordered by the shipper were furnished, the T. & P. agents had no instructions to make any record of efforts made to obtain cars of the size ordered nor to make any other memorandum or report, except entries on bills of lading and waybills showing the size of cars ordered and the size of cars furnished.
*16 11. No evidence was offered to show specifically wliat cars, if any, of the size and type ordered (or cars in the same minimum weight category) the T. & P. had available to fill the shipper’s order in the instant case at the time the order was received. There is no direct evidence as to what efforts the M. E. & T. or the T. & P. made at that time to supply the cars ordered, nor as to the particular circumstances under which longer cars were furnished in lieu of those requested.
Because of the destruction of the records referred to in the preceding finding, plaintiff was allowed to introduce secondary evidence consisting of the testimony of the Superintendent of Transportation of the T. & P. as to the procedure customarily followed by the T. & P. in 1944 in supplying freight cars ordered by shippers. The following is a summary of the facts shown by such evidence :
(a) If, at the time the shipper’s order was received, the M. E. & T. had had cars on its tracks of the size ordered, it would have had the authority to use such cars without consulting the carriers which owned the cars.
(b) When the M. E. & T. did not have cars of the size and type ordered on its lines, its agent at Mansfield would telephone his car requirements to the T. & P. agent in South Mansfield, some six miles away, if the shipment was to be routed over the T. & P. The M. E. & T. agent could also place the order with the Kansas City Southern Eailway Company, because the lines of that company connect with the tracks of the M. E. & T.
(c) When the T. & P. agent at South Mansfield received an order for cars from the M. E. & T. and had the cars on hand there, he would give instructions for delivery of the cars to the M. E. & T. and at the same time notify his superior, the T. & P. dispatcher at Alexandria, Louisiana. However, if the cars were not available at South Mansfield, the T. & P. agent would report the order to the chief dispatcher at Alexandria, who would then endeavor to locate the equipment on that division of the T. & P. The chief dispatcher had no authority to transfer cars from one division of the company to another. Therefore, when the chief dispatcher was unable to locate the cars on his division, he would *17 report the order to the Superintendent of Transportation, who would try to find the cars elsewhere on the T. & P. lines. If the equipment could not be located, the chief dispatcher of the division would be notified and other cars would be provided in lieu of the cars ordered.
(d) The T. & P. had car service agents, who traveled on its lines at all times and were charged with the duty of supervising the matter of furnishing freight cars.
(e) In cases where the effort was justified, the T. & P. would call on other railroads to meet special demands such as military requests for the shipment of large quantities of war machinery and vehicles. These requests were submitted through the Car Service Division of the American Association of Railroads, which maintained an elaborate set-up during the war for the purpose of supplying cars for these large military movements. Although the T. & P. and other railroads followed the same procedure in supplying cars for commercial traffic as for Government traffic, the Government traffic received preference in the allocation of railway equipment. A considerably longer time was required to obtain cars through the facilities of the A. A. R. than when the cars were supplied from the carrier’s own lines. Likewise, when cars were obtained from other lines through the A. A. R. set-up, the carrier securing the cars had to pay the transportation and per diem costs involved in moving the empty cars to the point of shipment. An incident illustrative of this situation occurred on March 31, 1944, when, the T. & P. was asked by the Army to furnish 393 40-foot flat cars or gondola cars for a shipment to be made on April 6, 1944. At considerable effort and expense, the T. & P. obtained 165 flat and gondola cars in a period of about a week. These cars were used interchangeably by the Armed Services for moving the vehicles and other material involved in the shipment. The record does not show how many of the 165 cars exceeded 41 feet 6 inches in length.
(f) There were occasions when the Kansas City Southern Railway Company provided cars at the request of the T. & P. for shipments arising at Mansfield to be routed over the lines of the T. & P. In the same way, the T. & P. frequently pro *18 vided cars for shipments which were to be routed over the Kansas City Southern from Mansfield.
(g) When Service Order No. 68 was issued, copies of the order were transmitted to the agents and operating personnel of the T. & P. However, the issuance of the order did not change the procedure that was followed by the T. & P. in providing freight cars to meet shippers’ orders.
(h) The T. & P. agent at South Mansfield in 1944 had been employed by the company since 1802 and had been at that particular station since 1913. He was a competent agent and was thoroughly familiar with the car supply procedure of the T. & P.
(i) InT944 the T. & P. did not own any 40-foot flat cars. It did own 50 cars which were 40 feet 9 inches long and were described in the Official Railway Equipment Register as steel flat cars with fixed ends, but these cars were built for carrying pulpwood. The floor of each car sloped toward the center, which had been lowered, and the cars were not suitable for transporting trailers. The T. & P. also owned 287 regular fiat cars, 42 feet in length. In addition it owned 1,200 all-steel gondola cars with flat bottoms, each 41 feet 6 inches in length. If the gondolas had been equipped with wooden floors, as in the case of some gondola cars, they would have been suitable for shipping the trailers involved here. Also, since these cars were not more than 41 feet 6 inches long, they carried the same minimum weight classification as cars 40 feet in length. However, the all-steel gondola cars were not satisfactory for the shipment of trailers, because there was no way vehicles shipped in them could be anchored or blocked to the floors of the cars.
12. In 1944 the railway car surplus was the lowest on record since 1923. Military requirements for freight cars were great and, therefore, all freight cars, particularly flat cars, were in short supply. Of the 1,843,365 freight cars owned in 1944 by Class I railroads, only 62,100 were flat cars. Of the 62,100 flat cars, there were 16,592 that were less than 40 feet 7 inches long and 30,786 less than 41 feet 7 inches long. In addition, there were 30,290 drop-end gondola cars less than 41 feet 7 inches long, but the record does not show how many of these had wooden floors to which vehicles, such *19 as the trailers with which this suit is concerned, could be anchored.
13. During 1944, as in other years, the A. A. E. filed with the Interstate Commerce Commission a report containing a weekly summary of car surplus and car shortage for each railway company and for the district in which it was located. Despite the fact that flat cars were generally in short supply during 1944, these reports for the weeks ending, respectively, on June 3,1944, June 10,1944, June 17, 1944, June 24, 1944, and July 1, 1944, showed that there was a surplus of flat cars and of gondola cars, both on the T. & P. and on the lines of the other railroads of the Southwestern District of which the T. & P. is a part. Although these reports indicated a surplus of the cars mentioned, the reports did not contain any information as to the dimensions of the cars nor as to where they were located on the various railway lines. El Paso, one of the stations on the T. & P., is approximately 1,000 miles distant from the T. & P. station at South Mansfield, Louisiana.
14. Plaintiff’s claim in this action is one of numerous claims involving the same issue, which plaintiff is asserting against the Government. Since both parties regard this as a test case, they presented evidence relating to matters other than the facts arising out of the shipments upon which this suit is based. The facts shown by such additional evidence are set forth in succeeding findings.
15. In 1928, the Interstate Commerce Commission issued Tariff Circular 20 containing “Eules to Govern the Instructions for Filing of Freight Eate Publications.” Eule 66 (a), which was published at that time and is still in effect, provides as follows:
* * * * *
66. minimum caRloads. — (a) Carriers provide cars of varying dimensions and capacities, and they provide minimum weights for the several kinds of cars based upon those dimensions and capacities. At times when transportation facilities are inadequate to supply the demand upon them it frequently is difficult or impossible for the carrier to furnish a shipper with a car of the dimensions or capacity desired by him, although the carrier has in its tariffs provisions for the use of *20 such car. Manifestly it is not equitable or proper to require the would-be shipper to pay additional transportation charges for the privilege of using a car of different dimensions or capacity from that which would suit his shipment or forego entirely his desire to ship.
Some carriers provide elastic rules which properly permit the use of cars of different dimensions or capacities when they are furnished by the carrier in lieu of those ordered by the shipper, while other carriers do not so provide, and as a result instances arise in which the initial carrier under such provision furnishes the shipper with car at its convenience, and connecting carriers that have not adopted similar provisions assess higher charges in accordance with their tariffs, thus imposing upon the shipper a wholly unexpected and, in the view of the commission, unreasonable charge.
The commission believes that when tariffs provide minimum weights which vary with the size or capacity of the car, it is the duty of the carrier to incorporate in such tariffs a rule to the effect that when a car of the dimensions or capacity ordered by the shipper cannot be promptly furnished, and when the carrier for its own convenience does provide a car of greater dimensions or capacity than that ordered, such car may be used on the basis of the minimum carload fixed in the tariffs for cars of the dimensions or capacity ordered by the shipper, 'provided the shipment could have been loaded into or upon ear of the capacity or size ordered; and that if a car of smaller capacity man that ordered by the shipper is furnished, it may be used on the basis of actual weight when loaded to its capacity, or that that portion of the shipment which cannot be loaded into the smaller car will be taken in another car and the shipment treated as a whole on the basis of the minimum fixed for the car ordered by the shipper; and that if the carrier is unable to furnish a car of large dimensions, ordered by shipper, it may furnish two smaller cars which may be used on the basis of the minimum fixed for the car ordered; it being understood that shipper may not order a car of dimensions or capacity for which a minimum is not provided in the carrier’s tariffs.
In all such cases the capacity of the car ordered, the date of such order, the nmnber, initials, and capacity of the car furnished should be stated on the bill of lading and the carrier’s waybill.
In case of controversy between shippers and carriers caused by the absence of such rule from tariffs which provide graduated minima for cars of different sizes the *21 commission will regard such, tariffs as prima facie unreasonable.
It is the duty of carriers to provide reasonable facilities for transportation, and if they can not furnish equipment to move the carloads provided for in their regulations it is clearly their duty to provide some other method of transporting as one shipment, and at the rate named therefor, such carload weight when tendered by shipper.
* * * # *
16. There were 20 amendments to Service Order No. 68 during the period it .was in force. The order was vacated and set aside by the Interstate Commerce Commission as of April 16, 1949.
Amendment No. 10, which was issued September 20,1945, and became effective on October 1,1945, provided in part as follows:
This order shall not apply when a large flat car is furnished in lieu of a smaller flat car ordered by shipper.
17. The 56th Annual Keport of the Interstate Commerce Commission dated November 1, 1942, included a discussion with respect to various emergency service orders that had been issued by the Commission. With respect to Service Order No. 68, the report stated:
* * * # i{t
Service Order No. 68 suspended also the operation of the car-substitution portions of Buie 34 of the Consolidated Classification. The operation of such rule was suspended insofar as it permitted railway freight cars to be used for the shipment of carload freight otherwise than subject to the carload minimum weight for each car used. The car-substitution portions of Buie 34 allowed the carrier to substitute a larger car for a smaller car ordered and to substitute two cars for a car ordered, and provided for protection of the minimum weight on the car ordered.
Service Order No. 68 suspended also the operation of all provisions in all other tariffs filed with us by railroad carriers which, in like manner as, or in modification or extension of Buie 24 and of the car-substitution portions of Buie 34, permitted railway freight cars (whether loaded by shipper or carrier) to be used for the shipment of carload freight, including livestock, otherwise *22 than subject to the established carload minimum weight for each car used. An exception was provided as to Rule 29 of the Consolidated Classification or to any similar provision in other tariffs relating to minimum weights of carload shipments of articles which by reason of their length require two or more open cars for their transportation.
Under Service Order No. 68, shippers are not required to accept cars of a different size than those ordered, but, if they accept and use such cars, they must either load the minimum weight for the car used or pay charges on the basis of the minimum weight for the car used.
The effect of this order was to materially increase the loading of freight cars. It also brought to light the fact that certain existing carload minimum weights were not properly adjusted. In order to handle protests against the operation of this order and to suggest changes which might alleviate hardships from this order, we appointed an employees’ committee consisting of the Directors of the Bureaus of Traffic, Service, and Inquiry and two examiners. This committee is called the Advisory Committee on Car Service Orders. Certain adjustments in minimum weights have been made by the carriers in cooperation with this committee, including a general change in the minimum weights applicable to open-top cars.
$ * $ * *
18. On five different occasions, the War Department went to the Interstate Commerce Commission, complaining about the effect of Service Order No. 68 and requesting that military shipments be exempted from the provisions of the order. The first attempt in this regard was made on July 1, 1943, when the Under Secretary of War wrote Interstate Commerce Commissioner J. Monroe Johnson as follows:
It has been brought to my attention that Service Order No. 68 issued by your commission and effective 15 February 1942 has resulted in a very substantial increase in the War Department’s transportation expenditure due to the necessity of moving freight by means of whatever equipment is available regardless of whether the size of the car furnished meets the particular needs of a shipment. I am also informed that the constant shortage of open-top equipment has aggravated this situation.
The Department appreciates that the purpose of Service Order No. 68 was to effect the further conserva *23 tion of railroad equipment. It is the intention of the Department, to the extent that military requirements permit, to obtain the maximum use of all railroad equipment utilized in the movement of Army shipments. Every effort has been made and will continue to be made to assure maximum loadings and the elimination of all inefficient use of equipment.
The War Department is of the view that Service Order No. 68, in so far as it is applicable to Department traffic, does not operate to conserve railroad equipment. It has, however, caused very substantial increases in transportation charges and unwarranted and increased revenue to the carriers. It is therefore requested that consideration be given to the issuance of an amendment to Service Order No. 68. An amendment containing substantially the following is suggested:
The provisions of this order in so far as it applies to the operation of tariff provisions and car service rules relating to shipments by or consigned to any organization or installation of the United States War Department, be and it is hereby, vacated.
You may desire to confer with a representative of the Department concerning this matter. Accordingly, I have directed The Judge Advocate General to designate an officer of his Department to call upon you. This representative will be available for conference and will endeavor to furnish any additional information you may desire.
Commissioner Johnson replied by letter of September 4, 1943, denying the relief requested and stating in pertinent part as follows:
Service Order No. 68 is quite broad in its application. In addition to its operation when a larger car is furnished than ordered, it suspends Rule 24 of the Consolidated Freight Classification providing for the use of follow-lot or trailer cars and a waiver of the carload minimum; it also suspends that portion of Rule 34, providing for the furnishing of two smaller cars for a larger car ordered, with a waiver of carload minimum weights.
If shipments consigned by or to the Army were exempted from the operation of Service Order No. 68, two cars could be furnished where only one was ordered, and this certainly would have an adverse affect [sic] upon carloading as well as car supply.
It is contended in the third paragraph of your letter that the order has not operated to conserve railroad *24 equipment. This order has been very instrumental in utilizing available car supply at a particular shipping point without resorting to the wastage of transportation by hauling empty cars hither and yon to meet the needs of a shipper for a car of a particular dimension.
While it is undoubtedly true that the order has caused increases in transportation charges with a consequent increase in revenue to the carriers, this fact alone is not a proper objection to the order in view of the limited number of cars which the railroads have at their disposal and the large volume of traffic being now carried.
For the present, at least, I feel that exemption of shipments by or consigned to any organization or installation of the United States War Department would be unwise.
19. On October 30, 1943, the War Department submitted to the Interstate Commerce Commission a formal petition requesting that Service Order No. 68 be set aside to the extent that it suspended the operation and application of Sections 2 (a) and 6 (a) of Rule 34 with respect to shipments made by or consigned to the War Department. The petition read in part as follows:
(4) The War Department makes and receives numerous interstate shipments of carload freight by common carriers by railroad, the transportation charges on which are paid by the War Department. In many instances, particularly in the case of open-top equipment, the rail carriers are unable to furnish cars of the length required and ordered and furnish cars which are greater in length than. required and ordered for the transportation of said shipments. Some of the shipments comprise commodities which are light loading, the weight of the quantity to be shipped barely equaling or being less than the minimum weight for the length of par ordered. Many shipments consist of articles which are of such size and shape that only a certain number can be loaded, regardless of the length of the car furnished. For example, only three gun mounts of a particular type can be loaded in a car, whether the car is 40 or 50 feet long. A great many shipments of War Department freight are of an emergency character and must be loaded and transported promptly in whatever cars are available at the time and place of shipment. Due to the emergency character of the shipments and the inability of the carriers to furnish cars of the length ordered, it is necessary to use the cars furnished *25 by the carriers for the transportation of such shipments, even though the cars are longer than required and. ordered and the circumstances of the particular shipment make it impossible to utilize the full capacity of the cars. A considerable number of shipments of this character are subject to Rule 34 of the Consolidated Freight Classification. The provisions of Service Order 68, as amended, require, however, that the carriers assess and collect from the War Department charges based upon the minimum weight established for the length of the car furnished by the carrier and used in the transportation of the shipment, notwithstanding the fact (a) that the minimum weight for the car furnished exceeds the minimum weight for the car ordered and the actual weight of the shipment, (b) that in box cars the loading capacity of the car furnished was not used, and (c) that on open-top equipment the lengths of the article or articles shipped were such that they could have been loaded on the car ordered.
(5) Service Order 68, as amended, in so far as it affects shipments made by or to installations of the War Department, does not result in heavier loading and a more efficient use of railway cars than would exist without said order. On the contrary, and for the reasons previously stated, the application of the order has resulted in the assessment to the War Department of increased transportation charges which are excessive and unjust and unreasonable. Said order has caused, and, so long as it is made applicable to War Department traffic, will continue to cause, a substantial increase in the aggregate amount paid or to be paid by the War Department for transportation services, required in the prosecution of the war, a result which, in the opinion of your petitioner, was not contemplated or intended at the time when the order was issued.
On December 13, 1943, the Commission granted the application for permission to file the petition. However, on March 6, 1944, the Commission entered an order denying the petition.
20. On January 9, 1945, the War Department submitted a second petition to the Interstate Commerce Commission, requesting that Service Order No. 68 be set aside to the extent that it suspended the operation and application of Section 6 (a) of Rule 34. The petition stated that Service Order No. 68 was less applicable to open-top equipment than *26 to box cars, because (1) shipments in open cars can easily be checked to determine whether the articles could have been loaded on a car of the size ordered; (2) only 57 percent of the flat and gondola cars were 41 feet 6 inches in length or less, and therefore the order affected 43 percent of the open-top cars but only 10 percent of the box cars. The petition also alleged that a tremendous volume of War Department traffic moved on open-top cars, and that many War Department shipments were of an emergency nature which had to be loaded and transported promptly in whatever cars were available at the time and place of shipment, even though the cars furnished were longer than the cars needed and ordered. It was further contended in the petition that Service Order No. 68 had not resulted in a more efficient use of open-top cars transporting War Department shipments, but had caused the assessment of increased charges which were excessive, unjust, and unreasonable; that in furnishing longer cars than ordered, the carriers were being unjustly enriched at the expense of the War Department, since it was unable to refuse the use of the cars furnished.
Attached to the petition was a schedule of shipments made in 1944, less than two years prior to the filing of the petition, on flat and gondola cars. The schedules showed that excess charges of more than $1,000,000 per year had resulted from the application of Service Order No. 68.
The Interstate Commerce Commission never acted on the petition of January 9, 1945. It was withdrawn because on July 20,1945, the carriers extended to the Government a rate quotation granting certain reductions, pursuant to Section 22 of the Interstate Commerce Act.
21. On January 10, 1949, representatives of the War Department conferred with Commissioner J. Monroe Johnson of the Interstate Commerce Commission and again requested relief from the application of Service Order No. 68. No action was taken to modify or vacate the order at that time, but Commissioner Johnson requested the American Association of Railroads to advise all the rail carriers that when the Army ordered cars of a size or type that were not immediately available, the carriers should inquire whether the shipments were of sufficient urgency to justify the use *27 of a substitute car. Commissioner Johnson also stated that the railroads should be instructed to use their best efforts to furnish the cars ordered whether there was an urgency or not.
22. By order of December 15, 1948, the Interstate Commerce Commission provided that Service Order No. 68 would expire on July 15, 1949, unless otherwise ordered by the Commission. On February 14, 1949, the War Department submitted a third petition to the Interstate Commerce Commission requesting that the order of December 15, 1948, be vacated and that Service Order No. 68 be set aside. It was alleged in the petition that the emergency which prompted the Interstate Commerce Commission to promulgate the order in 1942 no longer existed and that the enforcement of the order was requiring the War Department to pay premium rates amounting to more than one million dollars per year. Among other things, it was stated in the petition as follows:
***:;-:*
Every carload rate subject to a carload minimum weight which has been prescribed by the Commission, at least in part, is superseded by Service Order-No. 68 but, in the preceding case [Procter & Gamble Co. v. Pennsylvania R. Co. 270 I. C. C. 393], the Commission holds, and properly so, that the Order did not approve the resulting rates. At the same time, however, as to the carriers’ convenience rule, the Commission has denied reparation sought by shippers solely because of the existence of Service Order No. 68. Harrison Construction Co. v. Chicago, R. I. & P. Ry. Co., 263 I. C. C. and Burton v. Pennsylvania R. Co., 259 I. C. C. 64, 263 I. C. C. 799. The continuance of the Order, accordingly, is a requirement that shippers pay rates which, under long-standing precedents of the Commission are unjust and unreasonable, except in those instances where the shipper is able to load the increased minimum weight.
The effect of these orders on these Departments is illustrated by Appendix D, attached hereto, which lists 44 illustrative shipments and the penalty charges which have accrued thereon. As a result of this Order, it is estimated that, based on traffic which moved during the year ending 30 April 1948, the penalty charges which these Departments were required to pay to carriers who, for their own convenience substituted larger cars than *28 ordered, exceeded $1,000,000 (computed on the basis of rates now in effect and on an estimated 10,000 cars).
Army Kegulations and other directives have, and do, require personnel at all installations to load cars to their load limit or physical capacity and all steps are taken to insure maximum utilization of cars. However, when the carrier supplies cars larger than those ordered, many factors may prevent the loading of any additional quantities on the larger car. These factors include: (1) availability of the commodity at the origin point for shipment to the particular destination; (2) ability of consignment point to receive larger quantities; (8) bulky nature of a particular commodity; (4) the necessity of distributing a limited supply of a commodity to numerous points; and (5) necessity of moving materials at once in the interest of the national defense, which precludes a waiting period to permit carriers to furnish cars of the size ordered.
When the Departments’ installations are supplied with cars larger than ordered, which for example, double the minimum weight requirement because of the suspension of Sections 2 (a) and 6 (a) of Buie 34, the personnel handling the shipment are under appropriate directives of the Departments which require full loading. If it is not possible to load in excess of that planned for the car ordered, but the shipment must move, because of the necessities of these Departments, there are but two courses available: (1) reject the car, in the hope that a car of proper size will be supplied without too much delay, or (2)_ ship in the car supplied. In the first instance, the rejection of the car is generally impracticable because of the need for prompt movement and, if practiced, would simply result in additional switching by the carrier with resultant delay in the productive use of the larger car; in the second instance, the usual case, no increased loading has resulted from the operation of the Order, and the sole result is the payment of penalty charges to the carrier.
In view of the Congressional mandate as expressed in the last sentence of Section 1 (15) and in Section 6 (8) of the Act, it is obviously not a reasonable requirement that these Departments pay premium rates in excess of $1,000,000 a year for the privilege of moving its traffic. Division 3 has said, in effect, in Burton v. Pennsylvania R. Co., 259 I. C. C. 64, that a shipper must face the alternative of paying the higher rates or declining the cars. This obviously would require these Departments to face the alternative of either paying excessive rates or retard *29 ing, rather than expediting, traffic essential to the national defense.
The petition was never acted upon by the Interstate Commerce Commission. As stated above, Service Order No. 68 was set aside as of April 16, 1949.
23. There is no evidence that the War Department filed with the Interstate Commerce Commission any application or complaint seeking reparation of additional freight charges paid as a result of the application of Service Order No. 68 on the ground that such charges were unreasonable or unlawful. As stated above, the efforts of the War Department were directed toward having the Interstate Commerce Commission modify or set aside Service Order No. 68.
24. The first formal decision of the Interstate Commerce Commission with respect to the effect of Service Order No. 68 in a case where the carrier had provided a larger car than was ordered was Burton v. Pennsylvania Railroad Co., 259 ICC 64. In that case, the shipper alleged that the additional charges, which were collected as a result of the carrier furnishing larger cars than had been ordered, were unreasonable. The decision of the Commissioner to whom the case was referred for disposition pursuant to Section 17 (2) of the Interstate Commerce Act read in part as follows:
* * * While the facts establish that it was possible for the shipper to have loaded the shipments on the smaller cars ordered, there is an absence of any showing of the conditions under which the longer cars were furnished, or the reasons why such longer cars were not declined by the shipper at origin and not used. Our service order referred to was issued solely for the prevention of misuse and wasteful use of railroad equipment. Neither the carriers nor the shippers may deviate from the rule published pursuant thereto in the classification in the adjustment of charges based on the carload minima provided for cars of the size used. The evidence does not warrant a finding that the applicable charges under the rule were or are unreasonable.
This decision was affirmed in a report of December 5, 1945, 263 ICC 799, which read in part as follows:
The facts of record, as summarized in the prior report, are confirmed by the record on oral hearing. It is not *30 shown, that defendants were negligent in furnishing the larger cars. The shipper accepted and used the cars furnished in order to meet complainant’s urgent need for the road scrapers. It is clear that the charges collected were applicable under the governing tariff provision established on March 17,1942, in compliance with Service Order No. 68, providing, in effect, that where the shipper orders a car of a certain size and the carrier furnishes and the shipper uses a larger car, the applicable charges are those based on the carload minimum for the car furnished and used and not the carload minimum published in defendants’ tariff for the car ordered.
Complainant contends that to permit defendants to collect and retain charges based on the higher minima, provided for cars of the length used, is not in consonance with the declared purpose of the provision which was to conserve equipment in order to aid in the effective prosecution of World War II. This contention does not accord with provisions of our published order. By providing, in effect, that a shipper must reject the larger car, or at its convenience accept the car furnished for loading and pay the applicable charges for its use, the requirements contained in the provision are fair both to the shipper and carrier, and were clearly designed to conserve equipment by discouraging the carrier from furnishing and the shipper from accepting and using a car larger than actually necessary for transportation of the shipment. This objective of the tariff provision would not obtain if refund of freight charges were permitted to the basis of the lower minima for the shorter cars ordered but not used.
25. In five Interstate Commerce Commission Special Docket cases involving the application of Service Order No. 68, the Interstate Commerce Commission denied applications to refund freight charges collected by reason of the suspension of Hule 34, or denied applications of carriers to waive collection of such freight charges. In each case, the Commission ruled that the applicable minimum for the car or cars used had not been shown to be unreasonable. All of the cases were submitted on agreed statements of fact, and in each of them, the carrier joined with the shipper in applying for authority to refund the freight charges or for authority to waive the collection thereof from the shipper. The following is a summary of these special docket cases:
*31 (a) In Special Docket No. 199854, a complaint was filed in the name of the shipper, but the Atlantic Coast Line Railroad Company requested an order, authorizing the payment of freight charges accrued as the result of a 50-foot car being used in place of a 40-foot car ordered. The exhibit to the complaint stated that the railroad switching crew erroneously placed a 50-foot car for the 40-foot car ordered, although 40-foot cars were available, and one could readily have been furnished. When the shipper learned that a 50-foot car had been furnished, he telephoned the local freight yard and called attention to his order for a 40-foot car. He was incorrectly informed that the 50-foot car had been furnished for the carrier’s convenience and that the transportation charges would be at the same rate as for the 40-foot car. The carrier stated that the shipper should not be penalized for an error made by a railroad employee and requested permission to refund the difference between the charges for a 40-foot and a 50-foot car.
(b) In Special Docket 204900 a complaint was filed in the name of the shipper on July 9, 1945. The carrier, the Missouri Pacific Railroad Company, requested the Interstate Commerce Commission to enter an order authorizing the railroad to waive collection from the shipper of the difference between the freight on three 41-foot cars ordered and that on three 50-foot cars furnished. The complainant stated that the carriers through error had furnished the 50-foot cars, and in a letter to the Secretary of the Interstate Commerce Commission, the railroad company stated that there was no evidence that the shipper was in urgent need of the cars furnished and that the 50-foot cars had been placed at the convenience of the carrier and not of the shipper.
(c) In Special Docket No. 206144, a complaint was filed in the name of the shipper on November 12, 1946, but the carrier (Illinois Central Railroad Company) requested the Commission to enter an order authorizing the carrier to waive collection of freight charges representing the difference between the charges due on a 50-foot flat car that was furnished and the freight on a 40-foot flat car ordered by the shipper. The exhibit to the complaint stated that at the time the 40-foot car was ordered, a car of that size was *32 available in the yard where the order was placed. However, the carrier’s engine foreman took the first available flat car and spotted it at the shipper’s siding for loading. The shipper’s employees, who were inexperienced in rate matters, did not realize that the minimum charge for a 50-foot flat car would be higher than for a 40-foot flat car.
(d) In Special Docket No. 206375, a complaint was filed in the name of the shipper on August 7, 1946, consisting of the application of the Illinois Central Railroad Company for an order authorizing it to waive the collection from the shipper of freight charges, which represented the difference between the charge for a carload minimum weight of 24,000 pounds and those applicable to a carload minimum weight of 48,000 pounds. The shipment actually weighed 18,000 pounds, and the agreed statement of facts showed that the shipper had ordered a flat car to load a less-than-carload shipment of machinery weighing about 18,000 pounds. The carrier furnished a car 53 feet 6 inches in length. Later, the shipper was told that “this was possibly the only flat car on hand on that part of our line at that time.”
(e) In Special Docket No. 206852, the shipper filed a complaint requesting the entry of an order authorizing the waiver of an undercharge by the Atlantic Coast Line Railroad Company, and the carrier concurred in the application. In the agreed statement of facts, it was shown that the shipper placed an order for a car for loading a dragline weighing 37,300 pounds. The shipper did not specify nor did the carrier’s agent inquire as to the length of the car desired. As a result, a 50-foot car was furnished, although the shipment could have been loaded in a shorter car. The application further stated that the carrier’s agent was at fault in not informing the shipper as to the minimum weight classification of the longer car and that the carrier erred in furnishing a car, the use of which penalized the shipper.
26. Promptly after Service Order No. 68 was issued, copies of the order were served upon plaintiff and also upon the Association of American Railroads, as agent for all railroads, on January 31, 1942. On the same day, the A. A. R. sent a copy of the order to the transportation officer of each railroad with an accompanying letter, which read as follows:
*33 Attached is copy of Interstate Commerce Commission Service Order No. 68, which has been served upon the Association by the Commission as agent for all railroads.
This order requires that effective February 15 the provisions of Eule 24 of the Consolidated Freight Classification be suspended in its entirety and also those portions of Eule 34 which permit application of minimum weights lower than those provided for the car used; also that similar provisions in all other tariffs are likewise suspended.
This order has the effect of eliminating the use of trailer cars now permitted under Eule 24 and also eliminates the substitution rule of Eule 34 which permits the furnishing of two smaller cars for a larger car ordered, etc. In other words the carload minima will be that fixed for the car used and not for the car ordered.
The matter has been handled with traffic officers by Mr. Cleveland in the interest of necessary tariff changes, and the Order is sent to you at this time as information.
The plaintiff and the T. & P. uniformly applied and interpreted Service Order No. 68, in accordance with the explanation thereof in the above-quoted circular letter.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of two hundred thirty-nine dollars and eighty cents ($239.80).